IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LISA PURTUE,

        Plaintiff,

      v.                           Case No. 18CV204

STATE OF WISCONSIN DEPARTMENT
OF CORRECTIONS, SHAWNA UECKER,
CHERYL EPLETT, WILLIAM POLLARD,
JIM SCHWOCHERT, MARC CLEMENTS,
KELLI BROWN, KARI BEIER, TONJA
HESSELBERG, WINN COLLINS, MAKDA
FESSAHAYE, AND CATHY JESS,

        Defendants.

---

## DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' PROPOSED FINDINGS OF FACT

---

Defendants submit their reply to the Plaintiff's response to the Defendants' proposed findings of fact as follows:

### I.    Parties and witnesses.

1.    *Plaintiff Lisa Purtue was hired with Corrections in October 2013 and assigned to Dodge in December 2013. Upon hire, she signed the Employee Statement of Acknowledgment regarding Employee Discipline (Executive Directive # 2) and Work Rules (Executive Directive #43). (Beier Decl. Exs. 501 and 502 at 2.)*

    **RESPONSE:**    Admitted.

        **REPLY:**    **Undisputed.**

*Corrections terminated Purtue's employment for lying and falsifying an inmate conduct report on May 13, 2016. (Beier Decl., Ex. 506.)* [1]

**RESPONSE:** Admitted that these were the stated reasons for her termination: "<u>ostensibly</u> for lying and falsifying, etc."

> **REPLY:**   **Undisputed.**

2.     At the relevant time, several of the defendants were employed by the Wisconsin Department of Corrections (Corrections) at Dodge: William Pollard was the warden; Cheryl Eplett was the deputy warden; Joseph Falke was a captain; and Shauna Uecker was the human resources (HR) director. (Pollard Decl. ¶ 2; Eplett Decl. ¶ 2; Falke Decl. ¶ 2; Uecker Decl. ¶ 2.)

**RESPONSE:** Admitted

> **REPLY:**   **Undisputed.**

3.     The remaining defendants were employed by Corrections at the central office: Cathy Jess was the deputy secretary; Jim Schwochert was the administrator of the division of adult institutions; Marc Clements was the assistant administrator of the division of adult institutions; Kari Beier was the director for the bureau of human resources; Tonja Hesselberg was the director of the office of diversity and employee services; Kelli Brown was the employment relations program coordinator (now re-classified as human resources program officer for employment relations); Winn Collins was the chief legal counsel for Corrections; and Makda Fessahaye was

---

[1] Plaintiff separated some of Defendants' proposed facts into multiple parts. For clarity, these have been italicized throughout this reply.

a legal counsel for Corrections. (Jess Decl. ¶ 2; Schwochert Decl. ¶ 2; Clements Decl. ¶ 2; Beier Decl. ¶ 2; Hesselberg Decl. ¶ 2; Brown Decl. ¶ 2; Collins Decl. ¶ 2; Fessahaye Decl. ¶ 2.)

**RESPONSE:** Admitted

**REPLY:     Undisputed.**

4.     At the time of the Purtue Investigation, non-Defendant Kristine McElligott was a financial program supervisor with Dodge. Her employment history included the Federal Bureau of Prisons from 1988 to 2014. She served various roles, beginning as a correctional officer and eventually was lead investigator for Equal Employment Opportunity. She retired from employment with the federal government in January 2014 and then worked for Corrections. (McElligot Decl. ¶¶ 2-3.)

**RESPONSE:** Admitted

**REPLY:     Undisputed.**

## II.     Purtue's April 11, 2016 incident report and conduct report.

5.     Dodge is the intake institution where the custody classification is established for inmates admitted to Corrections. (Pollard Decl. ¶ 6.)

 **RESPONSE:** Admitted

**REPLY:     Undisputed.**

6.     On April 11, 2016, Purtue was passing out evening medications to the inmates on Unit 22 at Dodge. Around 7:30 p.m., Purtue called the unit sergeant and told her that she (Purtue) had just been assaulted. (Uecker Decl. Ex. 500 at 15, 20.)

**RESPONSE:** Admitted

**REPLY:**    **Undisputed.**

7.    Purtue said that, during medication pass, inmate Reddick threw a box through the trap door in the cell at her and it hit her in the mid-section. (Uecker Decl. Ex. 500 at 20.)

**RESPONSE:** Admitted

**REPLY:**    **Undisputed.**

8.



Photo of the trapdoor. (Falke Decl. Ex. 510.)

**RESPONSE:** Admitted

**REPLY:**    **Undisputed.**

9.



(Falke Decl. Ex. 509.)

**RESPONSE:** Admitted

      **REPLY:**    **Undisputed.**

10.    Purtue reported that she slammed the trap shut and called the sergeant. The sergeant reported the incident to Lieutenant Arndt, who came to the unit to escort Reddick to segregation. (Uecker Decl. Ex. 500 at 15, 20.)

    **RESPONSE:** Admitted

      **REPLY:**    **Undisputed.**

11.    Purtue went to the sergeant's control bubble. As Reddick was being escorted off the unit, he said, "that's right you hide in that bubble you pussy ass bitch." Purtue became upset and said that she was being bullied and harassed, that no one was doing anything about it, and now she had been assaulted for the first time in nine years. (Uecker Decl. Ex. 500 at 15, 20.)

    **RESPONSE:** Admitted in part. Purtue went into the sergeant's control bubble because she was told to go there by Lieutenant Arndt. (Purtue Declaration, ¶ 1.) Purtue was already upset when Reddick made the quoted statement, because of the incident at Reddick's cell door, and because of what had happened to her the day before. (Purtue Declaration, ¶ 2.) She did say that she was being bullied and harassed, that no one was doing anything about it, and that now she had been assaulted for the first time but did not mention nine years. (Purtue Declaration, ¶ 3.)

    **REPLY:**    **Objection, the cited material is insufficient to support a partial dispute. The Court should deem it undisputed.**

12.     Purtue later brought the box to the sergeant's bubble for evidence, and it was an empty Little Debbie Swiss Rolls box. (Uecker Decl. Ex. 500, at 16; Falke Decl. Ex. 509.)

**RESPONSE:** Denied. Karen Riehl went out and put the box in an evidence bag and she brought it to the bubble. (Purtue Declaration, ¶ 4.)

**REPLY: Disputed, but immaterial.**

13.     Purtue wrote an incident report and issued the inmate a disciplinary conduct report for assault on an employee, disrespect, disruptive conduct, and disobeying orders. (Uecker Decl. Ex. 500 at 20-21, 28.)

**RESPONSE:** Admitted

**REPLY: Undisputed.**

14.     In the conduct report and incident report, Purtue described the incident:

On April 11, 2016, I, Officer L. Purtue was dispensing medication when I came upon cell 6. As I opened the trap, inmate Reddick, Joseph … was offered medication, he, in turn, threw a box at me which hit my midsection. I then closed the trap, taking that as a refusal. … I, Officer Purtue, was not injured physically as a result.

(Uecker Decl. Ex. 500, at 20, 28.)

**RESPONSE:** Admitted

**REPLY:       Undisputed.**

15.     The assault was also reported to the Dodge County Sheriff for investigation in accordance with DAI Policy 300.00.70. (Falke Decl. ¶ 11.)

**RESPONSE:** Admitted, although there is no evidence as to what form this report took or that anything beyond this initial report occurred.

6

       **REPLY:**    **Undisputed.**

16.    Inmates who receive a conduct report for a major offense are entitled to a due process hearing, which means they may request witnesses and present evidence to a hearing officer. (Wis. Admin. Code §§ DOC 303.80 )

**RESPONSE:** Admitted

       **REPLY:**    **Undisputed.**

17.    In 2016, if an inmate was found guilty of the offense of assault on an employee, he faced a maximum penalty of 360 disciplinary separation, 20 days good time loss, and 40 days extension of his mandatory release date. Wis. Admin. Code Table DOC 303.72 (Register September 2014, No. 705.)

**RESPONSE:** Admitted, but "The penalty for an attempt may be the same as for the completed offense." (Wis. Admin Code § DOC 303.05(3)).

       **REPLY:**    **Undisputed.**

18.    For Reddick's conduct report due process hearing, he requested to review the video of the incident and to have the hearing officer and staff advocate review the video. (Uecker Decl., Ex. 500 at 29.)

**RESPONSE:** Admitted

       **REPLY:**    **Undisputed.**

19.    Reddick's request was granted on April 20, 2016. The video of the incident revealed that the empty box did not strike Purtue. Rather the box can be seen exiting the trapdoor to Purtue's right side, making no contact with her midsection. (Uecker Decl., Ex. 500 at 29; Ex. 500, at 35, 00:36 – 00:51.)

**RESPONSE:** Admitted

    **REPLY:**    **Undisputed.**

**III.**    **The Investigation into Purtue's potential work rule violation.**

20.    After reviewing the video, Security Director Dylon Radke referred the matter for an employee investigation into Purtue's potential violation of Corrections' work rule 6: "Falsification of records, knowingly giving false information, or knowingly permitting, encouraging or directing others to do so. Failing to provide truthful, accurate and complete information when required." (Uecker Decl. Ex. 500 at 1-2, 19; Beier Decl. Ex. 502 at 12.)

**RESPONSE:** Admitted

    **REPLY:**    **Undisputed.**

21.    On April 26, 2016, Cheryl Eplett, the deputy warden at Dodge, assigned the investigation to Captain Joseph Falke and Kristine McElligott. (Eplett Decl. ¶ 5; Uecker Decl. Ex. 500 at 2.)

 **RESPONSE:** Admitted

    **REPLY:**    **Undisputed.**

22.    Because McElligot was a trained EEO investigator for the federal government, she was one of the people at Corrections who are assigned investigations into possible employee misconduct or work rule violations. (McElligot Decl.¶ 4.)

 **RESPONSE:** Admitted

    **REPLY:**    **Undisputed.**

23.    Falke had been employed by Corrections since 2001, first as a correctional officer and then as a sergeant, lieutenant and captain. He received general investigator training in 2011 and PREA training in 2014, and is currently the investigative captain at Dodge. (Falke Decl. ¶¶ 2-3.)

**RESPONSE:** Admitted

   **REPLY:**    **Undisputed.**

24.    Falke has conducted hundreds of investigations regarding conduct of employees and potential work rule violations. (Falke Decl. ¶ 3.)

**RESPONSE:** Admitted

   **REPLY:**    **Undisputed.**

25.    Falke and McElligott reviewed the incident report and the conduct report prepared by Purtue. They also interviewed inmate Reddick, Purtue, Officer Hieland, Sergeant Brush,[2] and Lieutenant Arndt, and they watched the video of the incident. (Falke Decl. ¶ 6 Ex. 500, at 28; McElligott Decl. ¶ 7 Ex. 500.)

**RESPONSE:** Admitted

   **REPLY:**    **Undisputed.**

Reddick's Interview

26.    During the interview of inmate Reddick, he reported that he and Purtue had a conflict before the Little Debbie Swiss Roll box incident. Reddick's cellmate had been moved to another unit and he was assisting Officer Heiland with the pack up of his cellmate's belongings. (Uecker Decl., Ex. 500 at 17-18, 22.)

---

[2] In the Exhibit 500 investigation report, Sergeant Sara Bruesch's name is incorrectly spelled, "Brush." She is also referred to as Sergeant Sara Zoschke. (Uecker Decl., Ex. 500 at 3, 15-16.)

**RESPONSE:** Admitted, if "misunderstanding" is substituted for "conflict." It is apparent from the cited statement (Exh. 500 at 22) that Purtue had simply been unaware that Officer Heiland had directed Reddick to stand where he was.

**REPLY:** **Objection, argumentative. Subject to the objection, the proposed fact is undisputed.**

27. During the pack up, Reddick reported that Purtue was yelling his name over and over and yelling at him to sit down at a table. Reddick apparently explained to Purtue that he was helping Officer Heiland, which Heiland confirmed. (Uecker Decl. Ex. 500, at 17-18, 22.)

**RESPONSE:** Admitted that this is what he reported.

**REPLY: Undisputed.**

28. Reddick said that Purtue then walked away exasperated. The other officer took the garbage can from Reddick's cell to dump out and then set it outside of Reddick's open cell door. (Uecker Decl. Ex. 500, at 17-18, 22.)

**RESPONSE:** Admitted that this is what he reported.

**REPLY:** **Undisputed.**

29. Reddick reported that Purtue again yelled at him to take the garbage can into his room. Reddick believed Purtue owed him an apology over it. He then found the Little Debbie box and it was the last thing his cellmate had left behind. (Uecker Decl. Ex. 500, at 17-18, 22.)

**RESPONSE:** Admitted that this is what he reported.

**REPLY:** **Undisputed.**

30.    *Reddick began packing and looking at the box. Purtue came by later and asked if Reddick if he wanted his medications.*

**RESPONSE:** Admitted

**REPLY:**    **Undisputed.**

*Reddick was walking toward the door and said yes and stuck his hand out of the trap.*

**RESPONSE:** Disputed. He said nothing and did not approach the cell door. (Purtue Declaration, ¶¶ 12-13.)

**REPLY:**    **Disputed, but immaterial.**

*Purtue was on the right side of the door (from Reddick's perspective)*

**RESPONSE:** Admitted

**REPLY:**    **Undisputed.**

*and he threw the box to the left side of his door*

**RESPONSE:** Disputed. If he would have thrown the box "to the left side" of the cell door, he would have missed the trap, which was a sixteen-inch wide opening in the <u>middle</u> of the cell door.  (See photo at ¶ 8 above; Purtue Declaration ¶¶ 12-13.)

**REPLY:**    **Objection, argumentative and speculative. For clarification, the video shows that Reddick threw the box out of the trap to the left side of the cell door from Reddick's perspective. (Uecker Decl., Ex. 500 at 35, dkt. 33, Video at 00:45 – 00:48.)  The Court should deem it undisputed.**

*and stuck his hand out.*

**RESPONSE:** Disputed. He neither approached the door of the cell nor stuck his hand out. (Purtue Declaration ¶¶ 12-13.)

> **REPLY:**   **Disputed, but immaterial.**

*Purtue said, "well I'm taking that as a refusal," and closed his trap door. (Uecker Decl. Ex. 500, at 22.)*

**RESPONSE:** Admitted

> **REPLY:**   **Undisputed.**

31.    At his interview with Falke and McElligott, Reddick admitted he threw the box out and said he didn't know what he was thinking, that he supposed he wasn't thinking rationally. He compared himself to a child throwing a tantrum. Reddick said he had no intention to hit Purtue with the box, and he threw it in the opposite direction of where Purtue was standing because he didn't want to hit her with the box. (Uecker Decl. Ex. 500, at 22-23.)

**RESPONSE:** Admitted, that this is what he said, but it would be physically impossible to throw anything "in the opposite direction" from where Purtue was standing and still hit the trap door.

> **REPLY:**   **Objection, argumentative. The video shows the box leave the trap door not in the direction of Purtue's body. The Court should deem it undisputed. (Uecker Decl., Ex. 500 at 35, dkt. 33, Video at 00:45 – 00:48.)**

32.    Reddick also explained that he and Purtue had a previous conflict a few days before the incident where he thought Purtue showed favoritism toward other inmates. (Uecker Decl. Ex. 500, at 22-23.)

**RESPONSE:** Admitted that he said this.

**REPLY:    Undisputed.**

33.    On April 9th, Reddick told Purtue he was going to write an inmate complaint about her showing favoritism and Purtue apparently tried to convince him that he couldn't write one. (Uecker Decl., Ex. 500 at 24.)

**RESPONSE:** Disputed. (Purtue Declaration, ¶ 21.

**REPLY: Disputed, but immaterial because it is undisputed that Reddick reported this to the investigators.**

34.    *Then the next day, April 10th, Reddick reported that Purtue yelled at him for what he perceived to be no reason and he thought she owed him an apology.*

**RESPONSE:** Admitted that he said this in his interview.

**REPLY:    Undisputed.**

*When he approached her, she screamed at him to go to his room, so he went to his room.*

**RESPONSE:** Admitted that he said this in his interview. Disputed that it happened.

**REPLY:    Undisputed that Reddick reported this to the investigators.**

13

*Reddick said he had been asking for two weeks to be moved out of that unit because of*
*Purtue. (Uecker Decl. Ex. 500 at 24.)*

**RESPONSE:** Admitted that he said this in his interview.

**REPLY:** Undisputed.

**B.** **Sergeant Bruesch's Interview**

35. On April 29th, Falke and McElligott interviewed Sergeant Bruesch regarding the April 11th incident between Purtue and Reddick. (Uecker Decl. Ex. 500, at 15.)

**RESPONSE:** Admitted

**REPLY: Undisputed.**

36. *Bruesch did not directly observe any of the interactions between Purtue and Reddick.*

**RESPONSE:** Admitted that Sergeant Bruesch said this in her interview.

**REPLY:** Undisputed.

*Bruesch reported that she saw Purtue talking to Reddick through his cell door, but she*
*did not hear yelling or anything unusual, and Purtue did not appear to be in distress.*
*(Uecker Decl. Ex. 500, at 15.)*

**RESPONSE:** Admitted that Sergeant Bruesch said this in her interview.

**REPLY: Undisputed.**

37. Bruesch reported that she did not see or hear anything about the box until Purtue called her and told her that she (Purtue) had just been assaulted. (Uecker Decl. Ex. 500, at 15.)

**RESPONSE:** Admitted.

     **REPLY:**    **Undisputed.**

38.    *Purtue told Bruesch that Reddick threw a box at her and it hit her in the mid-section.*

     **RESPONSE:** Admitted that Sergeant Bruesch said this in her interview.

     **REPLY:**    **Undisputed.**

*Bruesch asked Purtue if the box hit her above or below her waist, and Purtue said it hit her in the knee caps. (Uecker Decl. Ex. 500, at 15-16.)*

     **RESPONSE:** Disputed. Seconds later, Bruesch said that Purtue had reported the box hitting her in the midsection. (Uecker Decl. Ex. 500, at 15, last answer.) It is unlikely that Bruesch actually said Purtue made both of these contradictory statements without the interviewer noting the contradiction and exploring it with Bruesch to make sure there had been no misunderstanding.

     **REPLY:**    **Objection, argumentative and speculative. The Court should deem it undisputed.**

39.    *Bruesch contacted Lieutenant Arndt, who came to the unit to take Reddick to segregation.*

     **RESPONSE:** Admitted. Sgt. Bruesch contacted Lt. Arndt to take inmate Reddick to segregation. (Uecker Decl. Ex. 500, at 15, last answer.)

     **REPLY:**    **Undisputed.**

*Bruesch said she did not see the Little Debbie box until Purtue brought a paper bag back to the Sergeant's bubble with the box in it as evidence. (Uecker Decl. Ex. 500, at 15-16.)*

**RESPONSE:** Admitted that she said this. Disputed that it occurred. Karen Reil picked up the item thrown, placed it in an evidence bag, then brought it back to the bubble. Purtue never touched the item at any point. (Purtue Declaration, ¶ 19)

**REPLY: Undisputed that Bruesch reported this to the investigators. As for the remaining, disputed but immaterial.**

40.    Bruesch also recalled Purtue telling her that Reddick had been yelling out of his door earlier during the shift. But Bruesch reported to Falke and McElligott that she did not hear any yelling from that area. (Uecker Decl. Ex. 500 at 15-16.)

**RESPONSE:** Misleading. She may not have heard any yelling but Sgt. Bruesch heard a cell door slam earlier and contacted Purtue to see what was going on. Purtue informed Sgt. Bruesch that inmate Reddick had slammed his door because he was angry that he could not be an inmate worker. Sgt. Bruesch informed Purtue to place a disciplinary warning on his discipline card for disruptive behavior. (See Purtue Dec ¶ 5.)

**REPLY: Objection, the cited evidentiary material does say that Sgt. Bruesch told Purtue to put a warning on Reddick's discipline card for disruptive behavior. Purtue's declaration says, "I issued a disciplinary warning for disruptive conduct." (Dkt. 47:2, ¶ 5.) The Court should deem it undisputed.**

16

**C.    Officer Heiland Interview**

41.    At Heiland's interview with Falke and McElligott, Heiland confirmed that Reddick was being helpful earlier that day when he was packing up his cellmate's belongings. (Uecker Decl. Ex. 500, at 17-18.)

**RESPONSE:** Admitted

    **REPLY:    Undisputed.**

42.    Heiland did not witness the box throwing incident, but he saw Purtue shortly afterward. Heiland heard Purtue call the Sergeant and say she needed a supervisor. Purtue showed Heiland the box later and told him the box had been thrown at her. (Uecker Decl. Ex. 500, at 17-18.)

**RESPONSE:** Admitted

    **REPLY:    Undisputed.**

43.    Purtue told Heiland that she offered medications to Reddick and that he refused, and she slammed the door. (Uecker Decl. Ex. 500, at 17.)

**RESPONSE:** Admitted, if "door" means "trap" and not "cell door."

    **REPLY:    Undisputed.**

44.    Heiland also reported to Falke and McElligot that Purtue said "Reddick threw a box and she shut the door because she did not want anything else thrown at her." Heiland could not recall whether Purtue said the box hit her. (Uecker Decl. Ex. 500, at 18.)

**RESPONSE:** Admitted

    **REPLY:    Undisputed.**

**D.     Lieutenant Arndt Interview**

45.     Falke and McElligott interviewed Lieutenant Arndt on April 29, 2016. Arndt said that Sergeant Bruesch reported the incident to him. (Uecker Decl. Ex. 500, at 14.)

**RESPONSE:** Admitted, except that he said, "It was reported to me by Sgt. Zoschke." (Uecker Decl. Ex. 500, at 14.)

**REPLY:     Undisputed. Sergent Bruesch and Zoschke are the same person.**

46.     Arndt specifically asked whether Reddick threw the box at her or whether he hit her with the box. Arndt directed Bruesch to find out the answer to that question. Bruesch called him back a little while later and said Purtue was hit by the box in the stomach area. (Uecker Decl. Ex. 500, at 14.)

**RESPONSE:** Admitted, except Arndt was talking about Sgt. Zoschke. (Uecker Decl. Ex. 500, at 14.)

**REPLY: Sgt. Zoschke and Sgt. Bruesch are the same person. (*See* dkt. 30-1:3.) Undisputed.**

**E.     Video**

47.     The video shows the interaction between Purtue and Reddick beginning with Purtue entering the view at 00:36. In the video, the box exits the trap door and lands on the ground, clearly not hitting Purtue, at 00:48. Purtue then closes and locks the trap door and walks away by 00:51. (Uecker Decl., Ex. 500 at 35, 00:36 – 00:51.)

**RESPONSE:** Admitted

    **REPLY:**    **Undisputed.**

**F.**    **Purtue Interview**

48.    Falke and McElligott interviewed Purtue on April 28th. Purtue reported that, on April 11th, she asked Reddick if he wanted his medications. Then she opened the trap and out flew a box. Purtue said she took that as a refusal and slammed the trap shut. (Uecker Decl. Ex. 500, at 4-5.)

**RESPONSE:** Admitted

    **REPLY:**    **Undisputed.**

49.    When asked to describe in detail what she saw, Purtue said, "He was in the back of the cell looking at me and did not give me a verbal response. All I saw was a box being thrown out at me. It hit me." (Uecker Decl. Ex. 500, at 5.)

**RESPONSE:** Admitted

    **REPLY:**    **Undisputed.**

50.    Purtue said she turned to get Reddick's medication and that is when she got hit by the box. She said the box hit her in the midsection, referencing the whole middle part of her body, and then flew off on to the floor. (Uecker Decl. Ex. 500, at 5.)

**RESPONSE:** Admitted

    **REPLY:**    **Undisputed.**

51.    Purtue also reported that she had previous interactions with Reddick, including the one that occurred the same day when Officer Heiland was packing up Reddick's cellmate's belongings. Purtue said she gave Reddick a warning the first day

he was on the unit and that she also told him she would not hire him as a swamper (inmate custodial worker) because of that warning. Purtue confirmed that Reddick asked her for an apology at some point, but she couldn't remember why. (Uecker Decl. Ex. 500, at 6.)

**RESPONSE:** Admitted

> **REPLY:** **Undisputed.**

52.    At that point in the interview, Purtue was again asked to clarify where the box hit her. Purtue answered that she reached for his medications and it hit her on the right side. Falke and McElligott then told Purtue that her story was inconsistent with the video and allowed Purtue to watch the video. (Uecker Decl. Ex. 500, at 7.)

**RESPONSE:** Admitted

> **REPLY:** **Undisputed.**

53.    After Purtue watched the video, Falke asked her what she saw during the video. Purtue said she went up to the door, talked to the person, a box flew out, and she closed the trap door. Falke asked Purtue if the box struck her. Purtue responded, "It does not look like it from there. But I felt something hit me." Falke asked Purtue several more questions, and Purtue continued with her story that "something" hit her. (Uecker Decl. Ex. 500, at 7.)

**RESPONSE:** Admitted

> **REPLY:** **Undisputed.**

**G.    Falke and McElligott's Conclusion**

54.    Based on their investigation, Falke and McElligott concluded that Purtue had provided false information and the facts supported violation of work rule 6. (Uecker Decl. ¶ 12 Ex. 500, at 9.)

**RESPONSE:** Disputed. The cited evidence Ex. 500, at 9, says "Potential Work Rules Violated," which seems at odds with memorializing a conclusion that the listed work rules *were* violated.

**REPLY:    This is not a proper dispute because the cited evidentiary material is not inconsistent with Falke and McElligott's conclusion. In addition, Falke and McElligott also submitted written declarations indicating they concluded Purtue had violated the work rule. (McElligott Decl, dkt. 22:3, ¶ 9; Falke Decl., dkt. 23:3, ¶ 12.) Undisputed.**

55.    While Purtue changed her story after watching the video to state that "something" hit her, Falke and McElligott did not find this to be credible for several reasons. (Falke Decl. ¶ 12 Ex. 500, at 9; McElligott Decl. ¶ 9.)

**RESPONSE:** Disputed. This is what they say now but this conclusion was not recorded at the time, so a reasonable trier of fact court reject this proposition. (Ex. 500, at 9.)

**REPLY: This is not a proper dispute because the cited evidentiary material says, "Officer Purtue stated at the beginning of the interview she saw a box being thrown out of the cell of inmate Reddick, #430318 and striking her in the midsection. She nonverbally referenced her entire midsection. After being shown the video evidence and being asked if**

**she saw evidence of the box hitting her, she stated that she felt something hit her." (Uecker Decl., Ex. 500 at 9, dkt. 30-1:9.) The Court should deem it undisputed.**

56.    First, the video did not show any reaction suggesting that something struck Purtue. She did not look down, back up, run from the area or try to determine what was thrown. Officers are trained that if anything is thrown from a cell/trap and especially if they are struck, they are to immediately retreat to a safe distance away. They do not remain in the area near an open trap or risk further harm by closing the trap. (Falke Decl. ¶ 10 Ex. 500, at 35.)

**RESPONSE:** Disputed. This is what they say now but this conclusion was not recorded at the time, so a reasonable trier of fact court reject this proposition. (Ex. 500, at 9.)

**REPLY: This is not a proper dispute. The video shows that she did not look down, back up, run from the area, or try to determine what was thrown. (Uecker Decl., Ex. 500 at 35, dkt. 33, Video at 00:45 – 00:48.) Plaintiff could have submitted a declaration disputing how officers are trained in these situations, but she did not. The Court should deem this undisputed.**

57.    Second, Purtue was very clear in the incident report that she was stuck in the midsection by a box thrown out of the cell by the inmate. She prepared a conduct report stating that the inmate assaulted an officer. The inmate was taken from his cell and placed in lock-up based only upon her word. (Falke Decl. ¶ 11.)

**RESPONSE:** Disputed. This is what they say now but this conclusion was not recorded at the time, so a reasonable trier of fact court reject this proposition. (Ex. 500, at 9.)

**REPLY: This is not a proper dispute. The documents attached to the employee investigation report and summary of findings clearly support Falke's conclusion. (Uecker Decl., Ex. 500 at 19-20, dkt. 30-1:19-20.) The Court should deem it undisputed.**

58.    Per DAI 300.00.70, the assault was reported to the Dodge County Sheriff for investigation based only upon her word. (Falke Decl. ¶ 11.)

**RESPONSE:** Admitted, although the Defendants never say how this report was accomplished or whether the Sheriff's Department ever did anything based on it. Moreover, it appears that the report was never retracted after Purtue's misstatement was discovered, so whether institution officials had ever expected a real criminal investigation is dubious.

**REPLY: Objection, argumentative. Undisputed that it was reported.**

59.    The truthfulness of officers in writing reports is very important as it can have life-changing impact on an inmate. (Falke Decl. ¶ 11.)

**RESPONSE:** Admitted

**REPLY:    Undisputed.**

60.    Purtue did not admit that she was mistaken or otherwise correct her prior statements, which appeared to be false. (McElligott Decl. ¶ 8.)

**RESPONSE:** Denied. She admitted that she had been mistaken in saying that the box had hit her. (See ¶ 53 above.)

> **REPLY: The cited evidentiary material does not support the alleged dispute. The Court should disregard it and deem this fact undisputed.**

61.   After preparing the summary of the investigation on the standard DOC form 1271E, McElligott had no further involvement. (McElligott Decl. ¶¶ 9-10.)

**RESPONSE:** Admitted

> **REPLY:   Undisputed.**

62.   *On May 9, 2016, Captain Pinkall and Falke attended a pre-disciplinary meeting with Purtue. Falke read the findings from the employee investigation summary. Falke gave Purtue an opportunity to provide any mitigating factors. Purtue said there were some inconsistencies in the investigation summary. She also said she has a bad memory,*

**RESPONSE:** Admitted

> **REPLY:   Undisputed.**

*she did not admit to anyone what was contained in the investigation summary,*

**RESPONSE:** Denied. It appears she was not asked at this predisciplinary meeting whether she admitted or denied any of the particular findings of the investigation summary.

The entire record of the predisciplinary meeting is:

Pinkall- Are there any mitigating factors you would like us to consider?

Purtue- What he just read there was some inconsistencies.

Falke- Anything else?

Purtue: I did not falsify documents, encourage others to do so. I reported everything as honest as I could. I wrote the conduct report on the date it happened. If you ask me 2 weeks after that, I cannot remember specifics. I have a really bad memory, that's why I write things down on paper. I did not admit to anyone what you just read. I did not admit to not being struck by the box, I assumed I was struck by the box. But I was hit by something.

(Uecker Decl. Ex. 500, at 11.)

Ms. Purtue was clearly talking about what she had said in the April 28 investigatory interview with Falke and McElligott, and it is unclear whether she is talking about what she said before she saw the video, after she saw it, or both.

**REPLY:    Objection, argumentative and not a proper dispute. At the pre-disciplinary meeting, Falke read the findings from the 1271E summary, while Pinkall took notes. Falke only read to Purtue, the summary of investigation findings on page 9 of Ex. 500. (Dkt. 30-1:9; Falke Decl., dkt. 23:3, ¶ 14.) So the only reasonable inference regarding what Purtue was talking about was the summary of the findings. The Court should deem it undisputed.**

*she did not admit to not being struck by the box, she assumed she was struck by the box, and she was hit by something. (Uecker Decl. Ex. 500, at 11; Falke Decl. ¶ 14.)*

**RESPONSE:** Admitted

**REPLY:    Undisputed.**

63.    After that, Falke had no further input and no involvement in the termination decision. (Falke Decl. ¶ 14.)

25

**RESPONSE:** Denied. It would appear that he wrote the report of the predisciplinary meeting. (Uecker Decl. Ex. 500, at 11.)

**REPLY: The cited evidentiary material does not support the alleged dispute because nowhere on page 11 of Exhibit 500 does it say that Falke prepared the report. In his declaration, Falke said that Capt. Pinkall took notes during the pre-disciplinary meeting. (Dkt. 23:3, Falke Decl., ¶ 14.) The Court should deem this proposed fact undisputed.**

## IV.  Purtue's termination following the investigation

64.    *Following the investigation, Warden Pollard was provided a copy of the investigation report, the exhibits, and the video. After reviewing the information, it was clear to Pollard that the box did not strike Purtue as she claimed it had in the conduct report.*

**RESPONSE: Admitted**

**REPLY:    Undisputed.**

*Pollard believed there was no evidence to support Purtue's position as to what happened and that the only reasonable conclusion after viewing the video was that Purtue used false information in official documents. (Pollard Decl. ¶ 5; Uecker Decl. Ex. 500.)*

**RESPONSE:** Admitted that this is what he says now. It is not believable that he did not think it was possible that Purtue had just made an honest mistake.

**REPLY: Objection, argumentative. The Court should deem this proposed fact undisputed.**

65.     *Warden Pollard considered this a serious rule violation. If Purtue's false reporting had not been discovered, the impact to the inmate would have been severe.*

**RESPONSE:** Disputed. See PSPFOF ¶¶ 63-83.

**REPLY: Objection, plaintiff does not cite evidence, but rather cites a legal document filed with the Court and the cited paragraphs do not support the alleged dispute. The Court should deem it undisputed.**

*Dodge is the intake institution where the custody classifications are established. An inmate who is found guilty of assaulting a staff member during intake will almost certainly be classified to maximum security. (Pollard Decl. ¶ 6.)*

**RESPONSE:** Admitted, but Riddick could not have been found guilty of assaulting an employee even if the box had hit Purtue, because there was no potential for bodily harm. See Plaintiff's Brief at Sec. VII.B.

**REPLY:   Objection argumentative. The proposed fact is undisputed. And in response to plaintiff's argument – if Reddick could not have been found guilty, it begs the question as to why Purtue charged him with the assault rule violation in the first place. The Court should deem this proposed fact undisputed.**

66.     This inmate was ultimately classified as medium and served his entire sentence at Jackson Correctional Institution, where there were more programs and privileges available than a maximum-security prison. (Pollard Decl. ¶ 6.)

**RESPONSE:** Admitted. The Defendants omit to inform the Court that he was also found guilty of two of the four offenses with which he had been charged by Officer Purtue, Wis. Admin. Code §§ DOC 303.29, Disrespect, and 303.33 - Disruptive conduct. (PSPFOF ¶ 77, Olson Declaration, Exhibit 11, at 5.)

> **REPLY:     Undisputed.**

67.     *Pollard made the initial decision to skip progressive discipline and proceed directly to termination.*

**RESPONSE:** Admitted

> **REPLY:     Undisputed.**

*He believed termination was necessary because Purtue's action had adversely impacted her ability to carry out her duties and responsibilities. Falsifying a document meant that she could not be trusted in her position. (Pollard Decl. ¶ 7.)*

**RESPONSE:** Denied. The evidence would permit the trier of fact to reject this defense. See, Plaintiff's Brief, 28-29.

> **REPLY: Objection, the plaintiff cites no evidence to support the alleged dispute. The Court should deem the proposed fact undisputed.**

68.     Pollard followed Corrections' Executive Directive 2 in determining the appropriate level of discipline. Executive Directive 2 specifically lists falsification of documents as a serious act of misconduct for which the Department may impose a more severe level of discipline, including discharge. (Pollard Decl. ¶ 8; Beier Decl., Ex. 502 at 8.)

**RESPONSE:** Admitted that this document did not preclude discharge for falsification of documents.

**REPLY: Undisputed.**

69.     Pollard considered the aggravating and mitigating circumstances surrounding the violation, the progression schedule, and just cause for discipline. He believed the facts surrounding Purtue's situation warranted termination. (Pollard Decl. ¶ 8.)

**RESPONSE:** Denied. The evidence would permit the trier of fact to reject this defense. See, Plaintiff's Brief, 28-29.

**REPLY:     Objection, the plaintiff cites no evidence to support the alleged dispute. The Court should deem the proposed fact undisputed.**

70.     Pollard met with Dodge's Shauna Uecker, the director of Dodge's human resources office, and Kelli Brown from Corrections' employment relations office to discuss the termination recommendation. (Pollard Decl. ¶ 9.)

**RESPONSE:** Admitted

**REPLY:     Undisputed.**

71.     Cheryl Eplett also participated in the meetings. Eplett agreed with the recommendation after reviewing the investigation packet, exhibits, and video. (Eplett Decl. ¶ 6.)

**RESPONSE:** Admitted

**REPLY: Undisputed.**

72.    Uecker reviewed the investigation and exhibits and agreed with Pollard's recommendation. (Uecker Decl. ¶ 7.)

**RESPONSE:** Admitted

**REPLY: Undisputed.**

73.    Kelli Brown also advised that the employment relations office would support skipping progressive discipline to termination for falsifying documents. (Brown Decl. ¶ 4.)

**RESPONSE:** Admitted

**REPLY: Undisputed.**

74.    Corrections' disciplinary action routing procedure required review at several levels before terminating a permanent employee. The investigation information and recommendation was sent to the individuals/offices at each level for review and recommendation. The disciplinary action routing slip process has the following progression: (1) human resources contact at the particular institution (Uecker); (2) appointing authority (Pollard/Eplett); (3) employment relations office (Brown); (4) division administrator (Schwochert/Clements); (5) the management advisory team (Brown/Beier/Hesselberg/Collins/Fessahaye); (6) the director of diversity and employee services (Hesselberg); (7) the bureau of personnel and human resources director (Beier); and (8) the Secretary's office (Jess). (Beier Decl. Ex. 505.)

**RESPONSE:** Admitted

**REPLY: Undisputed.**

75.     Uecker initiated the disciplinary action routing slip recommending termination of Purtue's employment on May 10, 2016. That same day, Cheryl Eplett signed the disciplinary action routing slip as the appointing authority from Dodge. (Uecker Decl. ¶ 7; Beier Decl. Ex. 505.)

**RESPONSE:** Admitted

**REPLY: Undisputed.**

76.     Kelli Brown signed the disciplinary action slip on behalf of the office of employment relations on May 11, 2016. In cases that involve a skip in progressive discipline or termination, the employment relations office also prepares a memorandum summarizing the investigation and obtains disciplinary comparators. (Brown Decl. ¶ 4; Beier Decl. Ex. 505.) The disciplinary comparators were three employees (one male and two female) who were terminated for lying and/or falsifying records. (Ex. 505 at 3.)

**RESPONSE:** Admitted

**REPLY: Undisputed.**

77.     The employment relations office forwarded the investigation packet, exhibits, routing slip, summary, and comparators to Administrator Jim Schwochert and Deputy Administrator Marc Clements for review. Clements and Schwochert supported termination and either verbally approved or signed the slip. (Brown Decl. ¶ 5; Schwochert Decl. ¶ 3; Clements Decl. ¶ 3; Beier Decl. Ex. 505.)

**RESPONSE:** Admitted

**REPLY: Undisputed.**

31

78.     The decision to terminate a permanent employee is then reviewed by the Management Advisory Team (MAT.) The MAT was made up of Employment Relations (Kelli Brown), Office of Diversity Equality Services (Tonja Hesselberg), Bureau of Personnel and Human Resources Director (Kari Beier), and the Office of Legal Counsel (OLC). Brown prepared the MAT meeting agenda and added the Purtue termination as an agenda item to be considered on May 12, 2016. (Brown Decl. ¶ 6; Beier Decl. Ex. 505.)

**RESPONSE:** Admitted

**REPLY: Undisputed.**

79.     The MAT members were provided with a copy of the investigation summary and comparators. During the meeting, there was a discussion of the facts, comparators, and recommendation. The MAT can agree or disagree with the recommendation. Brown has been in many meetings where the MAT will either recommend an escalation or determine that the recommendation is excessive. (Brown Decl. ¶ 7; Beier Decl. Ex. 505.)

**RESPONSE:** Admitted. While "The entire investigation packet and exhibits, routing slip, summary, and comparators were then forwarded to Deputy Administrator Marc Clements and Administrator Jim Schwochert for review." Dkt. # 26, Brown Dec. ¶ 5," only Brown's one-page investigation summary (dkt. # 32-5, 2), and her bare-bones list of three comparators she had selected (dkt. # 32-5, 3) were provided to the MAT members.

**REPLY: Undisputed.**

80. In Purtue's case, MAT agreed with termination based on the egregious facts. (Brown Decl. ¶ 8; Beier Decl. Ex. 505.)

**RESPONSE:** Admitted, except for "based on the egregious facts" as unsupported by the cited evidence.

**REPLY: Undisputed. As to the plaintiff's exception, Brown's declaration at paragraph 8 says verbatim, "In Purtue's case, MAT agreed with termination based on the egregious facts." The Court should disregard the alleged exception and deem the fact undisputed entirely.**

81. Collins and Fessahaye participate in this process in their role of providing legal advice as counsel for the Department. However, they were not decisionmakers, nor did they sign the routing slip. (Collins Decl. ¶¶ 3-5; Fessahaye Decl. ¶ 4; Beier Decl. Ex. 505.)

**RESPONSE:** Admitted

**REPLY: Undisputed.**

82. The recommendation then went to the office of diversity equality services director, Tonja Hesselberg. Hesselberg supported termination based on Purtue's falsification of documents. (Hesselberg Decl. ¶ 5; Beier Decl. Ex. 505.)

**RESPONSE:** Admitted, if it says "<u>ostensibly</u> based."

**REPLY: Undisputed. The plaintiff cites no evidence to support the alleged clarification that it was "<u>ostensibly</u> based." The Court should disregard it.**

83.    The next step was the bureau of personnel and human resources director, Kari Beier. Beier also supported termination for lying and falsifying documents. (Beier Decl. ¶ 13 Ex. 505.)

**RESPONSE:** Admitted.

    **REPLY:**    **Undisputed.**

84.    Cathy Jess, the Deputy Secretary, was the last stop for review in the routing process. Jess reviewed the investigation packet, exhibits, routing slip, summary, and comparators. After reviewing the information, Jess supported Purtue's termination for lying and falsifying documents. (Jess Decl. ¶ 5; Beier Decl. Ex. 505.)

**RESPONSE:** Admitted.

    **REPLY:**    **Undisputed.**

85.    The entire investigation packet was then returned to Kelli Brown, who advised Uecker and Pollard that Purtue's termination had been approved. Brown then reviewed and approved Purtue's termination letter. (Brown Decl. ¶ 11; Beier Decl. Exs. 505, 506; Uecker Decl. Ex. 500.)

**RESPONSE:** Admitted.

    **REPLY:**    **Undisputed.**

86.    On May 13th, Uecker called Purtue and informed her the investigation was complete and a disposition had been determined. Uecker gave Purtue the option to come into Dodge for a meeting to discuss the disposition, or Uecker offered to read it over the phone. Purtue chose to have Uecker read the letter over the phone. (Uecker Decl. ¶ 8; Beier Decl. Ex. 506.)

34

**RESPONSE:** Admitted.

 **REPLY: Undisputed.**

87. Uecker told Purtue the decision was made to terminate her employment and Uecker summarized the reasons as identified in the May 13, 2016, termination letter. After the call, Uecker sent the termination letter by mail to Purtue. (Uecker Decl. ¶ 9; Beier Decl. Ex. 506.)

**RESPONSE:** Admitted.

 **REPLY: Undisputed.**

88. Purtue did not know Falke before he was assigned to the investigation. He was not her supervisor and she cannot recall ever having a conversation or interaction with him other than during the interview.  (Purtue Dep; Dkt. 18:40.)

**RESPONSE:** Admitted.

 **REPLY: Undisputed.**

89. Purtue did not know Kristine McElligott before she was assigned to conduct the investigation with Captain Falke. Purtue has no contact with McElligot before the interview. (Purtue Dep; Dkt. 18:40.)

**RESPONSE:** Admitted.

 **REPLY: Undisputed.**

90. Purtue provided an example of a female officer (Keisha Gardner) who was allowed to view the video before preparing a conduct report. (Dkt. 18:55.)

**RESPONSE:** Admitted.

 **REPLY: Undisputed.**

## V. Purtue's Deposition

91.     Karen Riel told Purtue that she brought the "ticket" back down to her but Purtue never received it. (Dkt. 18, Purtue Dep. 53.)

**RESPONSE:**     Admitted, "ticket" referencing the conduct report Purtue had written about inmate Reddick. This is immaterial because it occurred on April 11, before anyone had seen the video.

**REPLY: Undisputed. The fact that no one had seen the video yet makes no difference.**

92.     Sergeant Kimball (female) received progressive discipline for lying about leaving her bubble to do count. (Dkt. 18, Purtue Dep. 51.)

**RESPONSE:** Admitted.

**REPLY: Undisputed.**

93.     Unidentified male employees could sleep and watch movies during third shift and were not written up (reported to superiors). They woke each other up if they saw someone coming. (Dkt. 18, Purtue Dep. 57-59.)

**RESPONSE:** Admitted.

**REPLY: Undisputed.**

94.     Purtue cannot identify any females who were disciplined for sleeping on 3rd shift. (Dkt. 18, Purtue Dep. 58.)

**RESPONSE:** Admitted.

**REPLY: Undisputed.**

95.      Male employees (Anderson, Johnson and Rory) received OWIs and kept their jobs. Purtue is not aware of any females who were terminated for OWI. (Dkt. 18, Purtue Dep. 62.)

**RESPONSE:** Admitted.

> **REPLY: Undisputed.**

96.      Sergeant Tome (male) was caught stealing gas and got his job back. Purtue is not aware of females who were instead terminated for theft. (Dkt. 18, Purtue Dep. 63.)

**RESPONSE:** Admitted.

> **REPLY: Undisputed.**

97.      Lt. Suttle (male) allowed an inmate to die in his care and was not terminated.  Purtue is not aware of females who allowed an inmate to die in their care and were terminated. (Dkt. 18, Purtue Dep. 63-64.)

**RESPONSE:** Admitted.

> **REPLY: Undisputed.**

98.      Officer Katze (male) brought tobacco and cell phone into the institution and was not terminated. Purtue is not aware of females who did so and were terminated. (Dkt. 18, Purtue Dep. 64.)

**RESPONSE:** Admitted.

> **REPLY: Undisputed.**

99.      Purtue is not aware of other male or female officers who were believed to have lied completing a conduct report. (Dkt. 18, Purtue Dep. 68.)

**RESPONSE:** Admitted.

> **REPLY: Undisputed.**

100.    Allegations against Falke—in charge of investigation, does not have any information that he made a termination recommendation. (Dkt. 18, Purtue Dep. 69.)

**RESPONSE:** If this means that Purtue does not have any information that Falke made a termination recommendation, Admitted. He just increased the probability of termination by falsely stating that Purtue had falsely claimed to see the box hit her, when she had never claimed to have seen the impact. (See, e.g., PSPFOF ¶ 4.)

> **REPLY: Objection argumentative. The proposed fact is undisputed.**

101.    There is no information that suggests (then) Dodge HR Director Uecker discriminated against females on basis of sex. (Dkt. 18, Purtue Dep. 70.)

**RESPONSE:** Denied. Dkt. # 45, Rohe report.

> **REPLY: Objection, the cited evidentiary material does not support the alleged dispute. Nowhere in Rohe's report does he identify Uecker. (Dkt. 45.) The Court should deem it undisputed.**

102.    There is no information that suggests (then) Deputy Warden Cheryl Eplett discriminated against females on basis of sex. (Dkt. 18, Purtue Dep. 70.)

**RESPONSE:** Denied. Dkt. # 45, Rohe report.

**REPLY: Objection, the cited evidentiary material does not support the alleged dispute. Nowhere in Rohe's report does he identify Eplett. (Dkt. 45.) The Court should deem it undisputed.**

103.    There is no information that suggests Warden Pollard discriminated against females on basis of sex, other than conclusory statement that he is "from the good ol' boys club." (Dkt. 18, Purtue Dep. 71.)

**RESPONSE:** Denied. Dkt. # 45, Rohe report.

**REPLY: Objection, the cited evidentiary material does not support the alleged dispute. Nowhere in Rohe's report does he identify Pollard. (Dkt. 45.) The Court should deem it undisputed.**

104.    There is no information that suggests DAI Administrator, Jim Schwochert, who hired her at Dodge, discriminated against females on the basis of sex. (Dkt. 18, Purtue Dep. 71-72.)

**RESPONSE:** Denied. Dkt. # 45, Rohe report.

**REPLY: Objection, the cited evidentiary material does not support the alleged dispute. Nowhere in Rohe's report does he identify Schwochert. (Dkt. 45.) The Court should deem it undisputed.**

105.    There is no information that suggests DAI Deputy Division Administrator, Marc Clements, who advised Purtue completed probation, discriminated against females on the basis of sex. (Dkt. 18, Purtue Dep. 72.)

**RESPONSE:** Denied. Dkt. # 45, Rohe report.

**REPLY:** Objection, the cited evidentiary material does not support the alleged dispute. Nowhere in Rohe's report does he identify Clements. (Dkt. 45.) The Court should deem it undisputed.

106. There is no information that suggests ER Program Coordiantor Kelli Brown discriminated against Purtue/ females on basis of sex. (Dkt. 18, Purtue Dep. 70.)

**RESPONSE:** Denied. Dkt. # 45, Rohe report. Brown also continued Falke's false statement that Purtue had said she'd *seen* the box hit her. (PSPFOF 59-62.)

**REPLY:** Objection, the cited evidentiary material does not support the alleged dispute. Nowhere in Rohe's report does he identify Brown. (Dkt. 45.) In addition, McElligott prepared the summary of the investigation, not Falke. (McElligott Decl., ¶ 9, dkt. 22:3.) So Purtue's claim that Falke made a false statement is based on false premises. The Court should disregard the response and deem the proposed fact undisputed.

107. There is no evidence that Kari Beier, who participated in decision to recommend termination as MAT member, made decisions or recommendations regarding termination on the basis of sex. (Dkt. 18, Purtue Dep. 73.)

**RESPONSE:** Denied. Dkt. # 45, Rohe report.

**REPLY:** Objection, the cited evidentiary material does not support the alleged dispute. Nowhere in Rohe's report does he identify Beier. (Dkt. 45.) The Court should deem it undisputed.

108.    There is no information that Tonja Hesselberg, the diversity and HR director for Corrections was also a member of the MAT, made any decision or recommendation to terminate on basis of Purtue's sex as a female. (Dkt. 18, Purtue Dep. 73.)

**RESPONSE:** Denied. Dkt. # 45, Rohe report.

**REPLY: Objection, the cited evidentiary material does not support the alleged dispute. Nowhere in Rohe's report does he identify Hessleberg. (Dkt. 45.) The Court should deem it undisputed.**

109.    There is no evidence or information that Collins and Fessahaye, Corrections legal counsel and members of MAT, made a decision or recommendation to terminate because Purtue is a female. (Dkt. 18, Purtue Dep. 73-74.)

**RESPONSE:** Denied. Dkt. # 45, Rohe report.

**REPLY: Objection, the cited evidentiary material does not support the alleged dispute. Nowhere in Rohe's report does he identify Collins or Fessahaye. (Dkt. 45.) The Court should deem it undisputed.**

110.    There is no information that Deputy Secretary Cathy Jess made a decision to terminate on the basis of sex as a female. (Dkt. 18, Purtue Dep. 74.)

**RESPONSE:** Denied. Dkt. # 45, Rohe report.

**REPLY: Objection, the cited evidentiary material does not support the alleged dispute. Nowhere in Rohe's report does he identify Jess. (Dkt. 45.) The Court should deem it undisputed.**

111.    Purtue is of the belief that individuals involved in the termination decision did so in an effort to ruin her graduation and vacation, which was scheduled around the date of the termination letter. (Dkt. 18, Purtue Dep. 79-81.)

**RESPONSE:** Denied. Unsupported by the cited evidence and immaterial.

**REPLY: This is not a proper dispute. Purtue testified at deposition pages 79-80:**

> **Q:    Is it your position that one or more of the individuals who were involved in the termination decision intentionally did that because you were going on vacation and graduating?**
>
> **A:    They all had access to vacation, and we all had to put in. Anybody could have saw that. Anybody could have access to our vacation schedules.**
>
> **Q:    So other than knowing about it, do you have any other information that would suggest these people would go to such lengths to ruin your vacation or your graduation?**
>
> **A:    Yes.**
>
> **Q:    What information is that?**
>
> **A:    They're pretty – it destroyed me and they all knew they were doing it … .**

**(Dkt. 18:20, deposition page 80, lines 3-19.) The Court should deem this proposed fact undisputed.**

## VI. Policies

112.   Employee Directive #2, G, provides as follows:

G. *Serious Acts of Misconduct.* The Department may impose a more severe level of discipline, up to and including discharge, for serious acts of misconduct. Employees who are found to have engaged in serious misconduct may be terminated as an initial level of discipline depending on the seriousness of the behavior. Serious acts of misconduct include, but are not limited to:

   1. Possession or use of illegal drugs or controlled substances without authorization of appropriate prescription.
   2. Theft.
   3. Lying or providing false information to management.
   4. Forging or fraudulently making or altering official documents including work documents, receipts, or medical slips.
   5. Fraternization with offenders, inmates, or juveniles including, but not limited to: sharing personal information, displaying favoritism, engaging in a personal relationship, failing to report solicitation by an offender, inmate, or juvenile.
   6. Staff sexual misconduct with offenders, inmates, or juveniles.
   7. Misuse or inappropriate use of computers such as accessing, receiving or disseminating inappropriate materials or information, which includes profanity, obscenity, or harassing content based on protected status, via e-mail, internet, or removable media.
   8. violations of criminal statutes.

(Beier Decl. Ex. 502, at 8.)

   **RESPONSE:** Admitted

   **REPLY: Undisputed.**

113.   Employee Directive #43, Department of Corrections Work Rules,

provides in relevant part as follows:

The Department of Corrections has established Work Rules which govern employee conduct so that the Department can carry out its mission and ensure the public's confidence in our ability to do so. When a work rule is violated, disciplinary action, up to and including discharge

may be taken. Work rules apply to on-duty conduct and off-duty conduct which adversely affects the ability of the Department to carry out its mission or adversely affects the ability of an employee to perform his or her duties and responsibilities.

\*\*\*

6. Falsification of records, knowingly giving false information, or knowingly permitting, encouraging or directing orders to do so. Failing to provide truthful, accurate and complete information when required.

(Beier Decl. Ex. 502, at 12.)

**RESPONSE:** Admitted

**REPLY: Undisputed.**


Dated: May 20, 2019.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

s/Rachel L. Bachhuber
RACHEL L. BACHHUBER
Assistant Attorney General
State Bar #1052533

s/Gesina S. Carson
GESINA SEILER CARSON
Assistant Attorney General
State Bar #1055162

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0188 (Bachhuber)
(608) 266-1672 (Carson)
(608) 267-8906 (Fax)
bachhuberrl@doj.state.wi.us
carsongs@doj.state.wi.us