IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LISA PURTUE,

                Plaintiff,

v.

STATE OF WISCONSIN DEPARTMENT OF
CORRECTIONS, SHAWNA UECKER, CHERYL
EPLETT, WILLIAM POLLARD, JIM SCHWOCHERT,
MARC CLEMENTS, KELLI BROWN, KARI BEIER,
TONJA HESSELBERG, WINN COLLINS, MAKDA
FESSAHAYE, CATHY JESS, and JOSEPH FALKE,

                Defendants.

OPINION and ORDER

18-cv-204-jdp

---

      Plaintiff Lisa Purtue was a correctional officer at Dodge Correctional Institution (DCI), a prison within the Wisconsin Department of Corrections (DOC). She was fired for making a false statement in a conduct report, but Purtue says that her termination was really motivated by sex discrimination. Purtue is suing the DOC under Title VII of the Civil Rights Act, and she is suing the individual decisionmakers under 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment.

      Defendants move for summary judgment, contending that Purtue was fired for violating an important work rule and no reasonable jury could find that defendants discriminated against her on the basis of sex. Dkt. 19. In their reply brief, defendants criticized one of Purtue's experts, former DOC secretary Ed Wall. In response, Purtue filed a document styled as a motion in limine to allow Wall's testimony. Dkt. 54. Purtue's motion would be more aptly described as a sur-reply, and the court will consider it. The court will also consider Wall's testimony, but it doesn't support Purtue's claim.

Purtue's strongest evidence is a statistical analysis showing that the DOC terminates women at higher rates than men. The statistical correlation suggests that gender bias affects some DOC decisionmaking. But Purtue has failed to adduce evidence that gender bias was a motivating factor in *her* case. Video evidence confirms that Purtue made a false statement in a conduct report. Purtue adduces Wall's opinion to show that her offense did not require termination, but Purtue cannot prove discrimination by second-guessing her employer's discretionary decisions. Despite the statistical evidence, Purdue does not cite any similarly situated male employee who was treated more favorably than she was. And Purtue has failed to adduce any other evidence that would show that her false conduct report was merely a pretext for discrimination. The court must grant defendants' motion.

UNDISPUTED FACTS

The following facts are undisputed, except where noted.

The DOC hired Purtue in 2013. She was assigned to DCI shortly after her hire, and she continued to work at DCI as a corrections officer until her termination in 2016. She performed well until the incident that led to her termination.

On April 11, 2016, Purtue told her supervising unit sergeant that prisoner Joseph Reddick had hit her with an empty box of Little Debbie snack cakes. As a result, Reddick was placed in segregation.

After Reddick was moved to segregation, Purtue wrote a disciplinary conduct report that charged Reddick with (1) assault on an employee, (2) disrespect, (3) disruptive conduct, and (4) disobeying orders. In the report, Purtue described the incident:

> On April 11, 2016, I, Officer L. Purtue was dispensing medication when I came upon cell 6. As I opened the trap, inmate Reddick,

2

> Joseph . . . was offered medication, he, in turn, threw a box at me which hit my midsection. I then closed the trap, taking that as a refusal. . . . I, Officer Purtue, was not injured physically as a result.

Dkt. 52, ¶ 14. In accordance with DOC guidelines, the incident was referred to the Dodge County Sherriff for possible criminal investigation.

Inmates who receive a conduct report for a major offense are entitled to a hearing, during which the inmate can present evidence to a hearing officer. As part of Reddick's hearing, the hearing officer reviewed video from the security camera across the cell range from Reddick's cell. *See* Dkt. 30 (video of incident). The video shows that a Little Debbie box was tossed out of Reddick's cell. But the box does not fly in Purtue's direction, and it does not strike Purtue as she stated in the conduct report. Reddick was found guilty of disrespect and disruptive conduct, but he was found not guilty of assault on an employee and disobeying orders.

Based on the discrepancies between the video and Purtue's conduct report, defendant Deputy Warden Cheryl Eplett opened an investigation into Purtue's conduct. DOC Work Rule 6 prohibits employees from falsifying records or knowingly giving false information. Dkt. 52, ¶ 20. Purtue had received a copy of these rules when she started working for the DOC. Eplett assigned Kristine McElligott (who is not a defendant) and defendant Captain Joseph Falke to conduct the investigation. Neither Falke nor McElligott knew Purtue before the investigation.

During the investigation, Falke and McElligott interviewed both Reddick and Purtue. Reddick told them that he had gotten into an argument with Purtue earlier that day and was still upset about it when Purtue came to his cell during medication pass. Reddick said he tossed the box out of his cell in frustration. But he claimed that he purposely threw the box away from Purtue and that he did not intend to hit her.

Purtue told the investigators that when she arrived at Reddick's cell during medication pass, she asked Reddick if he wanted medication and opened the trap door. She said that when she opened the trap a box flew out and hit her. When the investigators asked Purtue to describe in detail what she saw during the incident, Purtue said, "All I saw was a box being thrown out at me. It hit me." Dkt. 52, ¶ 49. She said she was turned towards the medication cart when the box hit her in the midsection and "flew off to the side." Dkt. 30-1, at 5. Purtue also confirmed that she had previous negative interactions with Reddick, including the argument earlier that day.

The investigators told Purtue that her description of the incident was inconsistent with the video, and they showed the video to Purtue. After watching the video, Purtue agreed that the box did not hit her. But she insisted that she felt something hit her during the incident. No other objects are visible in the video, and the video does not show Purtue reacting as if she had been struck by an object. Falke and McElligott filed a report summarizing the interview and stating that Purtue had potentially violated DOC Work Rule 6 against falsifying records. Dkt. 30-1, at 9.

Falke and another captain held a pre-disciplinary meeting with Purtue, at which they read the report and gave Purtue an opportunity to provide any mitigating explanation. Purtue said that there were some inconsistencies in the report, but she did not explain what they were. Purtue claimed that she had believed at the time of the incident that she had been struck by the box, but that she was actually hit by something else.

Defendant William Pollard, the warden at DCI, received a copy of the investigation report, the video, and all other exhibits used in the investigation. Under DOC disciplinary policy, lying or providing false information to DOC management is a serious act of misconduct

4

for which the DOC may impose severe discipline, including immediate discharge. Dkt. 32-2, at 8. Pollard made the decision to skip progressive discipline in this case and proceed directly to termination. (The parties do not fully explain the DOC's procedures for progressive discipline, but they agree that DOC policy gives supervisors the discretion to skip progressive discipline and immediately terminate employees for "lying or providing false information to management" or "forging or fraudulently making or altering official documents." Dkt. 52, ¶ 112.)

Pollard met with deputy warden Eplett and DCI's director of human resources, defendant Shauna Uecker. Also at the meeting was defendant Kelli Brown, a representative from the DOC's employment relations office. After reviewing the investigation materials, all three agreed with Pollard's recommendation to skip progressive discipline and proceed directly to termination.

As the human resources director, Uecker initiated the procedures for terminating Purtue. She filled out and signed a "disciplinary action routing slip." Dkt. 32-5. She then gave the slip to deputy warden Eplett, who signed it and forwarded it to Brown at the DOC's central office.

Brown wrote and attached a memorandum explaining why she believed Purtue's actions warranted termination. The memorandum essentially adopted the findings in Falke and McElligott's report. As required by DOC policy, Brown also obtained disciplinary comparators to confirm that termination was appropriate for Purtue's behavior. Brown cited the records of three other DOC employees (one male and two female) who had been terminated without progressive discipline for lying or falsifying records. Dkt. 32-5, at 3. One woman "failed to provide truthful info and knew offender was in the community and not serving jail time." The

other two employees provided false information in conduct or incident reports, and then provided false information in follow-up interviews. (The parties do not provide any other details of the other employees' misconduct.)

Brown's memorandum, and the recommended disposition, were reviewed and approved by two division administrators. The report was then reviewed by a "management advisory team." The team was composed of Brown, defendant Tonja Hesselberg from the Office of Diversity Equality Services, defendant Kari Beier, who was the DOC's director of personnel and human resources, and defendants Winn Collins and Makda Fessahaye from the Office of Legal Counsel. The team agreed that, based on Brown's report, termination was appropriate.

Finally, the entire investigation was reviewed by defendant Cathy Jess, the Deputy Secretary of Corrections. Jess approved Purtue's termination.

Warden Pollard drafted a termination letter. The letter explained that Purtue was being terminated for violating DOC work rules against falsifying records:

> On April 11, 2016 you reported you had been struck in the midsection with a cardboard box by Inmate Joseph [Reddick] . . . You completed an incident report and a conduct report for the inmate. This was deemed a staff assault and notifications were made to the proper staff groups and to the Dodge County Detective. After reviewing video evidence during the inmate's full due hearing, the video showed inconsistencies with your reporting of the assault. The box can be seen exiting the food port to your right side with no contact made to your midsection. . . .
>
> Employees who are found to have engaged in serious misconduct may be terminated as an initial level of discipline depending on the seriousness of the behavior. Falsification of official documents is a serious act of misconduct. Your actions severely damaged your reputation and the level of trust your supervisors have in you, a vital component for working in a correctional setting. Therefore, you have left me no choice than to terminate your employment.

Dkt. 32-6.

6

On May 13, defendants notified Purtue that her employment with the DOC was terminated and sent her a copy a copy of the termination letter.

The court will discuss additional facts as they become relevant to the analysis.

ANALYSIS

Purtue asserts claims for sex discrimination under Title VII of the Civil Rights Act and under 42 U.S.C. § 1983 for violation of the Equal Protection Clause of the Fourteenth Amendment. The same standard applies to both types of claims, *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003), except that the Title VII claim must be brought against the former employer and the § 1983 claims must be brought against the individual decisionmakers who discriminated against the plaintiff. *See Burks v. Wisconsin Dep't of Transp.*, 368 F. Supp. 2d 914, 919 (W.D. Wis. 2005). The parties analyze all of Purtue's claims together, so the court will do the same.

Under the Seventh Circuit's simplified approach to discrimination cases, at summary judgment the court reviews the evidence as a whole, focusing on the core question, which is whether the evidence would permit a reasonable jury to find that Purtue's sex was a motivating factor in her discharge. *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). But the court does not serve as a super-personnel department second-guessing employer policies or decisions. *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016). The critical question is not whether the termination decision was fair or wise, but whether proffered reason for it was a guise for discrimination. *Id*.

Purtue's argument has two parts, and it is patterned roughly on the burden-shifting framework from *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973), which remains a useful

way to present and assess discrimination evidence. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). First, she contends that a statistical analysis of DOC terminations shows that women are terminated at disproportionately higher rates than men. Second, she contends that the proffered reason for her termination—the falsified conduct report—is insufficient to justify her termination.

**A. Statistical analysis of DOC terminations**

Purtue submitted a report from Karl Rohe, a statistics professor at the University of Wisconsin. Dkt. 45. That report was based on comprehensive employee discipline data from the DOC for a five-year period from July 2011 to June 2016. Dkt. 46-1. Information regarding terminations was extracted from this data, Dkt. 46-6, and Rohe analyzed the termination information.

During the five-year period, women represented about 20 percent of the DOC workforce (947 of 4,832 employees), but women represented about 31 percent of those terminated (58 of 189). Another way of stating these proportions is that from July 2011 to June 2016, the DOC terminated 6 percent of its female employees but only 3 percent of its male employees. This is just basic arithmetic: Rohe's expertise as a statistician comes into play with his conclusion that the results are statistically significant, which means that they are not likely the result of random variation. Defendants haven't challenged that conclusion, so it isn't necessary to discuss the specifics of the report.[1]

---

[1] Terminations at DCI followed the general DOC pattern. Women represented about 21 percent of the workforce (82 of 392) but about 33 percent of terminations (3 of 9). So DCI terminated about 4 percent of its women employees but only about 2 percent of the men. But there were only nine terminations from DCI, which is a very small sample. Rohe did not separately evaluate the statistical significance of the data from DCI.

Rohe's report ought to be troubling to the DOC because it suggests that gender bias affects some termination decisions. But the question in this case isn't about DOC's general practices; it is about whether the decision makers in this case discriminated against Purtue in particular because of her sex. It is well established that statistical evidence can support a discrimination claim, but it's not enough on its own enough to forestall summary judgment for defendants. S*ee, e.g., Baylie v. Fed. Reserve Bank of Chicago*, 476 F.3d 522, 524 (7th Cir. 2007); *Norman-Nunnery v. Madison Area Tech. Coll.*, 625 F.3d 422, 431 (7th Cir. 2010). To hold otherwise would essentially shift the burden to the employer to disprove discrimination in any case in which there is a statistical imbalance. But that is only appropriate on a disparate impact claim, which Purtue is not pursuing in this case.

As the Seventh Circuit has recognized, the problem with statistical evidence is that it provides limited insight into any particular decision. A plaintiff can bridge that gap through evidence that the defendants treated "similarly situated" employees more favorably. *Eaton v. Indiana Dept. of Corr.*, 657 F.3d 551, 559 (7th Cir. 2011). Employees are similarly situated if they "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Weber v. Universities Research Ass'n, Inc.*, 621 F.3d 589, 594 (7th Cir. 2010) (quoting *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002)).

Purtue doesn't have that kind of evidence. For example, all but one of the other employees she discusses in her brief worked at other prisons, and thus were initially disciplined by other decisionmakers. More fundamentally, Purtue hasn't identified any men who engaged in conduct similar to hers but weren't fired. Rohe's report didn't consider the reason for

termination, so his analysis does not show whether there is any gender disparity in terminations for serious misconduct. In her brief, Purtue cites about a dozen examples from the spreadsheet of male employees who were disciplined—but not terminated—for lying or making false statements. Dkt. 50, at 15–17. But the spreadsheet does not provide enough information to determine whether any of these employees engaged in conduct comparable to Purtue's. *See, e.g.,* Dkt. 53, ¶ 35 (citing employee who was listed as "making false, inaccurate statement").

Purtue concedes that she is not aware of any other officers, male or female, who made a false statement about an inmate in a conduct report who were not terminated. Dkt. 52, ¶ 99. Defendants reasonably considered this to be a particularly egregious form of misconduct. It is not evidence of discrimination that the DOC disciplines officers, but does not terminate them, for lesser forms of dishonesty.

So Purtue needs other evidence that defendants discriminated against her. She does not cite any direct evidence of discriminatory animus, such as expressions of gender bias in the workplace. Instead, she says that her conduct did not justify her termination and that the work rule violation was really a pretext for a discriminatory termination.

**B. Evidence of pretext**

If the employer articulates a legitimate, non-discriminatory reason for an adverse action, the plaintiff can establish discrimination by showing that the proffered reason was merely a pretext for discrimination. But "[p]retext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." *See Smith v. Chicago Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015).

Purtue offers four main reasons for why defendants' proffered reason for her termination is a pretext for discrimination. The first three reasons involve what Purtue

describes as distortions of the facts related to her conduct: (1) defendants misrepresented the statements that Purtue made during the misconduct investigation; (2) defendants exaggerated the potential consequences of her false report; and (3) defendants uncritically accepted Reddick's account of the incident. The distortions alleged by Purtue are significant because if an employer is dishonest about the reason for an adverse employment action, that dishonesty supports an inference that the real reason is discriminatory. *Coleman v. Donahoe*, 667 F.3d 835, 855 (7th Cir. 2012). The fourth reason is that, based on the opinion of former Wisconsin Secretary of Corrections Ed Wall, Purtue's conduct simply did not warrant termination. For the reasons that follow, none of these reasons are sufficient forestall summary judgment for defendants.

1. **Purtue's inconsistent statements to the investigators**

Purtue says that defendants misrepresented the statements she made during her interview with Falke and McElligott to make it appear that her statements were inconsistent and that she changed her story after she saw the video. Falke and McElligott reported that "Purtue stated at the beginning of the interview she saw a box being thrown out of the cell of inmate Reddick, #430318 and striking her in the mid-section . . . [but after watching the video,] Purtue stated that she never saw anything hit her as was indicated in the beginning of her interview." Dkt. 30-1, at 9. Brown adopted this summary verbatim in her own report. Dkt. 32-5.

Purtue says that these are misrepresentations because Purtue never said she "saw" the box hit her. Instead she said, "All I saw was a box being thrown out at me. It hit me." Dkt. 30-1, at 5. Purtue is correct in this detail: she did not actually say that she saw the box hit her. But she originally stated that that she saw the box being thrown at her and that the box had hit

11

her. After viewing the video, she said that she "felt something hit me. Like I said, I did not see anything flying at me." Dkt. 30-1, at 7. Purtue changed her story after she saw the video.

The reports provide a substantially accurate summary of Purtue's statements. Discrepancies in paraphrasing Purtue's statements, if there are any, are so minor that they do not suggest pretext. No reasonable jury could find that Falke, McElligott, or Brown intentionally misrepresented Purtue's statements.

2. **Significance of Purtue's false report**

Purtue contends that defendants exaggerated the consequences of the false conduct report to justify the termination decision. According to Warden Pollard, if the falsity of the conduct report had not been discovered, it could have led to Reddick's conviction for assault and consequently his assignment to a maximum-security prison. Dkt. 20, ¶ 6. But according to Purtue, Reddick could not have been convicted of assault even if he hit her with the box because the empty, light-weight box was incapable of causing any bodily harm, which is an element of assault under Wis. Admin. Code § DOC 303.13. That isn't necessarily true. Although the box would be unlikely to cause any significant injury, it could have caused Reddick some pain, which is included in the definition of "bodily harm" in § DOC 303.02.

More important, Purdue's argument misses the point. Defendants did not fire Purtue because of the actual or potential consequences to Reddick specifically. Reddick got only what he deserved for his misconduct. What matters is that a charge of assault can carry a serious consequence for an inmate. A false allegation of assault made by a DOC employee constitutes a serious insult to the integrity of the institution and it might well have grave consequences for the falsely accused inmate. Reddick was acquitted in this case because the video showed that Purtue's conduct report was false. Whether Reddick might also have been acquitted of the

assault charge because the Little Debbie box was too flimsy and light to cause injury is really irrelevant.

The seriousness of Purtue's conduct is clearly stated in DOC written policies. DOC Work Rule 6 specifically prohibits falsification of records or giving false information, and under DOC disciplinary policies lying or giving false information is a serious act of misconduct that could result in immediate termination. No reasonable jury could find that defendants have deceptively exaggerated the gravity of Purtue's misconduct.

### 3. Defendants' acceptance of Reddick's statements

Purtue contends that defendants uncritically accepted inmate Reddick's version of events, according to which he did not intend to throw the box at Purtue. In response to an interrogatory, defendant Uecker stated, "Reddick was investigated and disciplined for throwing the box, but he was not disciplined for throwing the box *at Complainant* because he clearly did not throw the box *at complainant*." Dkt. 53, ¶ 86 (emphasis in original). Purtue contends that whether Reddick threw the box at Purtue was actually disputed, because she said the box was thrown at her. According to Purtue, Reddick's version shows her more unfavorably, so defendants adopted it to justify the termination decision.

Reddick's version is consistent with the video. As Uecker explained at her deposition, her interrogatory answer was based on the video of the incident, not Reddick's statements alone. Dkt. 39 (Uecker Dep. 15:23–16:2). And the video itself plainly shows that the box did not travel in Purtue's direction. Defendants did not simply accept Reddick's version without corroboration to make Purtue's conduct look worse.

### 4. Opinion of Ed Wall

Purtue adduces the expert report of Ed Wall, former Wisconsin Secretary of Corrections. Dkt. 44. Wall's explanation of DOC termination decisions confirms facts that are not disputed: DOC termination decisions are discretionary. Wall also says that termination decisions were unfairly inconsistent during his tenure as DOC secretary, which prompted him to intervene in some of those decisions. But the most important part of Wall's opinion is that Purtue's termination was not warranted. He believes that Purtue might have been mistaken rather than deceptive in her statement that the box hit her; that the potential negative consequences to Reddick were merely speculative; and that given Purtue's otherwise good job performance, termination was unwarranted.

The court will assume that Wall is qualified to give the opinions in the report. But his opinion does not raise a genuine issue of material fact for three reasons. First, Wall does not opine that the historical inconsistency in DOC terminations was the result of gender discrimination. At his deposition, he could remember only one termination decision in which he intervened, and that one involved a white male who was disciplined for making a lynching joke on Facebook. Dkt. 17 (Wall Dep. 26:4–16). Neither Title VII nor the Constitution provide a remedy for generalized inconsistency or unfairness in employment decisions.

Second, parts of Wall's opinion are based on speculation. He speculates that Purtue might have flinched, possibly causing her utility belt to bump against her, which might have felt like something had hit her. He also speculates that because her termination was unwarranted, "something else was in play in the determination to terminate." Wall cites no factual basis in the record for either of these comments. The court excludes these opinions as unreliably speculative.

Third, and most important, Wall's opinion that Purtue should not have been terminated is irrelevant. Wall offers a reasoned, professional opinion that termination was "not the expected result." Dkt. 44, at 5. But Purtue cannot prevail on a discrimination claim by showing that her termination decision was unwise or unfair, even if that showing is supported by an expert opinion. To show pretext, a plaintiff must show more than that the adverse decision was wrong; the proffered reason must be a sham. And Wall does not say that the termination decision so deviated from professional standards that the proffered reason for it could not be credible.

In sum, nothing in Wall's opinion supports the idea that the proffered reason for Purtue's termination was a pretext for discrimination.

CONCLUSION

Purtue committed a particularly serious violation of an important work rule, which defendants deemed to warrant immediate termination. Purtue has adduced statistical evidence that gender bias plays a role in some termination decisions at the DOC. And Purtue has marshalled evidence, in the form of Wall's opinion, that termination was not the only reasonable outcome for her. But Purtue has failed to adduce any evidence that defendants did not fairly investigate her misconduct, honestly state their findings, and reach the sincere conclusion that termination was warranted.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 19, is GRANTED.

2. Plaintiff Lisa Purtue's motion in limine to permit the testimony of Ed Wall, Dkt. 54, is GRANTED in part and DENIED in part, as explained above.

3. The clerk of court is directed to enter judgment and close this case.

Entered August 16, 2019.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge